Joseph L. Anderson and Donna Mae Anderson v. Commissioner.
Anderson v. Commissioner
Docket No. 70537,
United States Tax Court
T.C. Memo 1959-123; 1959 Tax Ct. Memo LEXIS 124; 18 T.C.M. (CCH) 549; T.C.M. (RIA) 59123; June 15, 1959
*124 Held, assuming that the loss from sandblasting here in question is a casualty loss within the meaning of section 165 (c)(3) of the Code of 1954, the loss was not deductible in the taxable year 1955 since the casualty actually occurred in 1953 and it was apparent prior to 1955 that there was no reasonable likelihood of recovery of compensation for the loss. William Bernard Clinton, Esq., and Clark G. Clinton, Esq., for the petitioners. Robert B. Milsten, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: The principal issues presented for our decision are (1) whether petitioners sustained a casualty loss deductible within the meaning of section *125 165 (c)(3) of the Code of 1954; (2) if so, was it sustained in the taxable year 1955; and (3) the amount thereof. Findings of Fact Some of the facts are stipulated, and, as stipulated, are incorporated herein by reference. Joseph L. and Donna Mae Anderson are husband and wife, residing in Eastland, Eastland County, Texas. They filed their joint return for the taxable year 1955 with the district director of internal revenue for the Dallas, Texas, district. During the year in question, they were both employed by the Southwestern Bell Telephone Company, the husband as traveling auditor and the wife as chief operator. Petitioners kept their records and filed their returns on the cash basis. Prior to 1950, petitioners purchased a lot for the amount of $1,400, located at 408 S. Dixie Street, Eastland, Texas, and constructed a 5-room frame residence with a 2-car garage attached thereon. They moved into the house on Labor Day 1950 before it was completed. Thereafter, petitioners made various improvements on said property. On April 1, 1953, petitioners' cost of improvements was in the amount of $12,156.57, making a total cost of the property on that date in the amount of $13,556.57, *126 which amount did not reflect the value of wiring labor and other labor rendered by petitioners. On or about April 1, 1953, the exterior of petitioners' residence and garage, which was covered with pine siding, showed cracked and peeling paint. Petitioners contracted with All-Tex Modernizers, through Sam E. Burns, managing partner, to remove the old paint by sandblasting, and to repaint the premises. Petitioners agreed to pay All-Tex Modernizers the net amount of $412, of which $100 was paid in advance. While petitioners were both at work, the employee of the paint contractor proceeded to remove the old paint from the aforesaid house and garage by sandblasting the wood surfaces of the property, and in so doing damaged the exterior siding. The sandblasting had cut the soft pulp out and left the hard ground of the wood like a "furrow board." The sandblasted surfaces gave the appearance of a house 25 years old which had never been painted. The employee of the paint contractor could have stopped the sandblasting at the start when he first noticed that it was "cutting into the wood" but, pursuant to instructions of his employer received over the telephone, he continued the process *127 with the resultant damage. The contractor, who was in Abilene, Texas, when the sandblasting was done, told the employee that he would visit the job site sometime during the day. The sandblasting was done all in one day. Petitioners did not see the damaged surfaces until all of the sandblasting had been completed. Petitioners requested the paint contractor to repair the damaged surfaces, but he failed to do so. Petitioners then employed an attorney to recover damages from the contractor. Petitioners secured financial credit reports from a well know credit agency showing All-Tex Modernizers to be a partnership composed of Sam E. Burns and A. L. Hopkins. A credit report, dated December 18, 1953, states, in part, that the partners were experiencing some difficulty in establishing their business, but were not found owing money at the sources consulted; that Burns had very small personal resources in his name; and that Hopkins was reported to own some equity in his home in Abilene and some personal effects. In a supplemental credit report, dated December 22, 1953, it is stated that Burns had been unsuccessful in previous business ventures and that a bank reported a very modest checking *128 account was maintained for the business while operating in Abilene, Texas, with some checks returned because of insufficient funds. In a later supplemental report, dated April 30, 1954, it is further reported that Burns, when interviewed, indicated he was then negotiating to sell the contracting business which had been unprofitable and that he was going to return to the road as a salesman. Investigation of local credit circles at that time revealed that Burns could not obtain credit locally. After obtaining the aforesaid credit reports, petitioners demanded payment of damages from Burns, and filed suit on January 3, 1955, for recovery of damages to their property. Thereafter, petitioners consulted with their attorney on several occasions with respect to the progress of the suit. Petitioners were informed in 1955 that the contractor had opened a place of business in Fort Worth, Texas, and owed a telephone bill in that city of several hundred dollars. Later in 1955, petitioner received information that the contractor's telephone service had been suspended for nonpayment of his bill and that no recovery could be made by the telephone company. On the basis of this information, petitioners *129 abandoned the lawsuit in April 1955 without recovery of damages. In 1957, the 91st District Court of Eastland County, Texas, issued a document dismissing, among some 30 others, petitioners' suit against Burns, for nonprosecution, which read, in part, as follows: "On this the 27th Day of February, A.D. 1957, it appearing to the Court that plaintiffs do not desire to prosecute the hereinafter styled and numbered causes, and plaintiffs' attorneys have requested that they be dismissed; "IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that the following styled and numbered causes be, and they are hereby dismissed at the cost of plaintiffs." Petitioners consulted a building contractor with respect to the damaged surfaces of their residence and garage and were advised that the only way to restore the property to its former condition (i.e., before the sandblasting) was to remove all exterior woodwork on the sides of the house and garage and replace it with new material. Petitioners secured estimates for the replacement of the damaged garage doors in the amount of $239.80 and $1,695.30 for the replacement of all other damaged material, or a total amount of $1,935.10, exclusive of any *130 damages which might occur to the interior walls resulting from the hammering in replacing the exterior siding. In 1956, T. L. Fagg, an experienced realtor and appraiser in Eastland, Texas, who was familiar with the property in question, valued said property at $15,000 immediately before the sandblasting damage occurred, and in the amount of $13,000 immediately thereafter. In their 1955 Federal income tax return, petitioners claimed a casualty loss deduction in the amount of $2,000. Respondent disallowed the claimed deduction in full. Petitioners sustained a loss prior to the taxable year 1955 in the amount of $2,000 as a result of the sandblasting damages to their property involved herein. Opinion In view of our holding, infra, that the loss in question is not deductible in 1955, we need not consider the issues relating to whether or not the loss was a casualty loss within the meaning of section 165(c)(3) of the Code of 1954, or the amount of the loss sustained. The burden of proof lies with taxpayer to establish error in respondent's determination that the loss was not deductible in 1955. See (C.A. 10, 1943), affirming *131 a Memorandum Opinion of this Court. We think he has failed to meet this burden, and that the affirmative evidence of record supports respondent's position. There is no dispute about the fact that the actual physical loss occurred in 1953. The issue as to the year of deductibility revolves around the question of whether, up to 1955, there was such reasonable prospect of recovery of compensation for the loss that deductibility should be deferred until 1955. There is no suggestion of recovery through insurance in the instant case, and the sole possibility was recovery from the contractor. The law neither requires nor permits a taxpayer to be an incorrigible optimist in this respect, and does not permit the taxpayer to select at will the year of deduction. See . In , in a like context, quoting in part from , certiorari denied , rehearing denied, , we said (p. 160): "it seems better practice to allow the deduction for that entire amount of damage (not covered *132 by insurance) in the year in which the loss actually occurs * * * rather than to defer it until subsequent events indicate whether or not a recovery is to be had from other parties for a part of the loss." It is to be noted that we referred only to the "better practice," and we do not here hold that it must be applied to all circumstances in which casualty losses were suffered which might be compensated for by recovery other than through insurance. We do hold, however, that it is a practical test well adapted to the circumstances of the instant case where the prospects of recovery were slight, if any. We do not think it would be helpful to discuss the many cases dealing with the issue of the year of deduction of casualty losses. The issue is substantially one of fact, and the cases are decided in the setting of the facts there involved. Suffice it to say that we have been referred to no case, and we have found none, which permits deferment of deduction to a year subsequent to that in which the physical loss occurred on so slight a prospect of recovery of compensation as that here presented. Credit reports procured by petitioner in 1953 did not indicate that the contracting company *133 or its partners had any substantial resources. The reports did show that Burns had been unsuccessful in previous business ventures, and that checks on the modest checking account of the business had been returned for insufficient funds. A 1954 report stated that Burns had indicated that the business had proved unprofitable and that he was negotiating to sell it. Local credit circles revealed that Burns was unable to get local credit at that time. The fact that petitioner did not institute suit until 1955 cannot, of itself and under the circumstances of this case, defer the deduction to that year. Petitioner cites , involving determination of the year of worthlessness of securities. The case is clearly distinguishable from the instant case on the facts and we find no statement of principles inconsistent with the views here expressed. The same applies to , which involved the year in which deduction should be taken for an embezzlement loss in a background of facts widely differing from those here presented. In , petitioner *134 failed to establish his inability to recoup his outlay. In that case, there was no suggestion that there was any effort made by taxpayer to recoup his loss or that the alleged obligor was not financially responsible. We are not required to determine whether the loss was deductible in 1953 or 1954. We think it quite clear, however, that the circumstances of the instant case do not support our making an exception to the rule of the "better practice" noted in We think that at least in 1954 there was no reasonable prospect of recovering compensation for the loss, and that deferment of the deduction to 1955 is unwarranted. We may add that petitioner has clearly failed to sustain his burden of proof to the contrary. Decision will be entered under Rule 50.